# COURT OF ERRORS AND APPEALS

OF THE

# STATE OF NEW JERSEY,

ON APPEAL FROM THE COURT OF CHANCERY,

AT NOVEMBER TERM, 1860.

Between JOHN BLACK and others, appellants, and JAMES SHREVE and others, respondents.

A deed to be valid must go into the hands of the grantees with the consent of the grantors.

In the absence of all evidence to the contrary, mere possession by the grantee of a complete instrument is sufficient evidence of a lawful delivery.

Mere tradition of a sealed instrument, even to the party in whose favor it is drawn, does not necessarily in all cases make it a deed.

A sealed instrument, intrusted to a party with authority to deliver it to the grantee in case certain conditions are complied with, will not become a deed if delivered without compliance with such conditions.

If the instrument be once delivered to the party who on its face is entitled to it, it becomes *eo instanti* a deed, and no agreement in conflict with its plain terms will be permitted to be proved to show that its operation as a deed is to depend on the performance of some condition subsequent.

Where the proof is clear that final transfer of the instrument was not to be made unless certain terms were complied with, the law puts the party claiming its benefit to the proof of compliance.

Parol evidence to defeat an instrument as a deed is admissible to show that

Black *v.* Shreve.

when the defendants, or some of them, signed the instrument, it was stated by them, to the agent procuring their signatures, that it should be binding on them only in the event of its execution by certain other persons.

Neither does it make any difference whether the agent ever communicated the limitation to the party accepting the deed.

The principle is settled, that one who claims through a special agent takes the risk of his want of power.

The minutes of a corporation are not evidence of an agreement alleged to have been made by the stockholders as individuals, and not intended to bind the corporation.

The object of an issue out of chancery to be tried by a jury is to inform the conscience of the Chancellor, and it is his province to determine what evidence shall be read before the jury.

The action of the Chancellor on the verdict is a matter resting in his discretion, and is not subject to review in the appellate court.

Where twenty-one out of thirty-seven stockholders of a railroad company sign and deliver a bond for the payment of $35,000 to three of their own number, and it appears, upon the face of the instrument, that the bond was to be binding upon such as should sign it, and that each should become responsible when and as he signed it, parol proof is not admissible to show that it was not to be binding on *any*, until all the stockholders had signed it.—Per VREDENBURGH, dissenting.

A bond in the following words—"We, John Black, Thomas Haines, (&c., naming nineteen others,) stockholders in the Delaware and Atlantic Railroad, send greeting: Whereas the Delaware and Atlantic Railroad Company borrowed of John Black and (two others) $35,000, and whereas we, whose names are hereunto subscribed and seals affixed, have agreed with the said Black and others that in case the corporate property should fail to pay said $35,000 and interest, so that a loss or deficiency should happen, that in that event each of us and each of them, the said Black and others, shall sustain an equal portion of said loss," expresses upon its face that each should become responsible when and as he signed it, and excludes parol proof that none were to be responsible until all the stockholders of the company had signed it.—Per VREDENBURGH, dissenting.

*Browning* and *Halsted,* for appellants.

*Vroom* and *Attorney General,* for respondents.

The opinion of the court was read by Judges WHELPLEY and OGDEN.

WHELPLEY, J. The amount of money, rather than the difficulty of the questions involved in this cause, invests it

Black *v.* Shreve.

with more than ordinary interest. Were it otherwise, I should be content to cast my vote without attempting to assign reasons for it.

Without designing an elaborate examination of the law or evidence, I will proceed briefly to mention some of the many reasons which have determined me to cast my vote for the affirmance of this decree.

The respondents rest their case upon a single point—that the covenant of the defendants, upon which their liability depends, was never, in the legal sense of the word, delivered to the complainants, and that for that reason it never had any legal vitality though signed by them.

Until an instrument under seal is delivered by those who sealed it, or with their consent, it has no legal operation as a deed; delivery is essential for that purpose. It must go into the hands of the grantees or covenantees by the consent of the grantors or covenantors; possession acquired by force or finding, or in any other mode than by the full consent of the party to be bound, is ineffectual.

In the absence of all evidence to the contrary, mere possession of a complete instrument by the grantee is sufficient evidence of a lawful delivery.

Mere tradition of a sealed instrument, even to the party in whose favor it is drawn, does not necessarily in all cases make it a deed. A deed complete in form, signed and sealed, may be handed to the party for inspection. If he should refuse to return it, and claim that the mere tradition of the paper so executed was a legal delivery, he could not hold it. The answer would be, that the tradition, although to the party, was not a delivery of the paper as a deed. It was not a final parting with the custody of the paper. A taking under such circumstances would be a tortious taking. Trover would lie for the paper. It would be a mere lending of the paper, not a delivery. So if the party to be bound suffer the paper to go into the hands of a third person, with authority to de-

.liver it in case certain conditions are complied with, a transfer of the paper without compliance with the conditions is no delivery for want of authority in the agent to do the act. It is the duty of the party thus accepting a tradition of the instrument to see to it that the agent in the act of transfer is authorized to do it, unless he be the party's general agent. If the instrument be once delivered to the party who on its face is entitled to it, it becomes *eo instanti* a deed. No agreement in conflict with the plain tenor of the deed is permitted to be proved—to show that its operation as a deed is to depend upon the performance of some condition subsequent.

I fully concur in the clear and learned opinion of Hornblower, C. J., in *The State Bank* v. *Evans*, and that of Chancellor Kent, in his Commentaries, 4 *Kent* 454, that the distinction between a delivery of the instrument, as the deed of the party to a third person as agent to be delivered to the grantee upon the happening of some contingency or the performance of a condition, and a delivery of the instrument as an escrow, to take effect as a deed upon such contingency happening or condition performed, is too subtle and evanescent to control so common a transaction.

In the one case, the sealed instrument is handed to the agent complete, so far as execution is concerned, that is signing and sealing, and so it is in the other. In neither case is the party bound by it until the contingency happens or condition performed. In neither case is it, in the full legal sense of the term, the deed of the party. In both cases it is not the deed of the party, because it has not come into the possession of the grantee, or if it has, without the consent of the grantor. In both cases the grantor has done nothing more than consent that it may go into the final possession of the grantee upon terms complied with. It seems to make no difference in what form of words the depositary is authorized irrevocably to transfer the possession of the instrument to the grantee.

What different legal consequences flow from the words, I deliver it as my deed, to be handed by you to the grantee upon compliance with the conditions, or the words, I hand it to you, and authorize you to utter the words or to do the act, from which the law conclusively infers the utterance of the words, *qui facit, per alium facit per se.* The conclusive act is the authorized traditions of a complete instrument; that constitutes a delivery—nothing else does. The case of *Evans* v. *The State Bank* has stood for twenty-five years as the settled law of this state. It accords with principle and the weight of authority and furnishes a plain practical rule of practice.

I do not perceive that any practical inconvenience can result from this doctrine. The power to transfer the custody of the paper seems just as irrevocable, if made so by the grantor, in the one case as the other. If it be a conveyance of lands, no title will pass until the contingency happens or the condition is performed. I do not think it necessary to review the cases cited in the opinion of the Chancellor or on the argument.

Although the custody and possession of a complete instrument under seal by the grantee, covenantee, or obligee is sufficient evidence of delivery, if not overcome by proof that the grantee came improperly into possession of it in ordinary cases, yet where the proof is clear that the final transfer to the party was not to be made unless certain terms or conditions were complied with, the law puts the party claiming its benefit to the proof of compliance. The power to transfer is subject to the performance of a condition precedent, which must be proved, and is not to be inferred from the unexplained possession.

It is a question of agency, and the power of the special agent to do the act must be shown. *Story on Agency* 126; *Paley on Agency* 194; 3 *Kent's Com.* 620, *4th ed.*

The power of an agent to do an act is not to be inferred from the act alone by him as such; the power and its

extent must be shown either by direct or circumstantial evidence.

The question of fact to be decided by this court upon the evidence, attaching such weight to the finding of the jury upon the issue ordered by the Chancellor to inform his conscience as upon the evidence before them it may seem to merit, is, did the covenant, signed and sealed by the persons whose names appear upon it, ever pass into the possession of the complainants finally and absolutely by their authority. If the complainants have established this fact they are entitled to a decree for the performance of it; if not, the bill must be dismissed.

As the covenant is perfect on its face, and is in the actual possession of the complainants, the only question seems to be, did it come to their possession, there to remain by the consent of the covenantors?

Upon the principles stated, this depends upon the single question, was its delivery to the complainants—I use the term in its full technical sense—forbidden unless all the stockholders of the Delaware and Atlantic Railroad Company executed it?

It is obvious that, as all the stockholders did not sign and seal it at the same time, and as it was carried about by different persons to obtain signatures, that the liability of those who did sign and seal it could be prevented from attaching at the moment of execution only by a declaration by those, or some of those who signed, that it should not bind them unless all signed and sealed it; that was a declaration that, as to them, the instrument was incomplete, unexecuted, until all signed and sealed it. If it was so to be considered, such a declaration could not have been intended to limit their liability upon a completely executed and delivered instrument, but as a declaration, that until that was done the covenant was not executed, and was therefore unsusceptible of delivery, and not to be delivered.

This is the precise issue made by the bill and answer

stripped of the verbiage rendered necessary by the double meaning of the term *delivery*, signifying, as a popular word, mere tradition, and in legal phraseology meaning the *final absolute transfer to the grantee* of a complete legal instrument sealed by the grantor, covenantor, or obligor.

This is what the complainants' bill means when it states that the defendants did make, execute, enter into, and "deliver" the covenant. So, also, the defendants' answer means the same thing when, instead of denying in strict legal terms the delivery of the instrument, it states the acts antecedent to and attending the transfer, avoiding the denial of a legal proposition composed of blended facts and law for the purpose, proper in itself, of refraining from swearing to a conclusion of law, and therefore using the term *deliver* in its popular sense, as signifying transfer of possession. It states that the agreement, when executed by those who did so, was executed, that is signed and sealed, subject to an express understanding that it was to be executed by all the stockholders of the company, and that the same was not to be obligatory and binding on such as did execute until it was so executed by the other stockholders, and denies that the covenant ever was or could have been delivered as a binding instrument, until the other stockholders executed the same. Laying aside all mere logomachy, this is a clear and full denial of two things.

1. That the instrument ever was completely executed as intended by the parties.

2. That, as a consequence, there was no legal delivery —a denial of legal delivery. That all were to execute, and did not so do, are stated as showing that there was no legal delivery.

The facts are stated, leaving the court to determine upon them the question of legal delivery. The answer further states, that many of those who did sign, as well as those who refused, were urged to execute on the special

ground that the same was to be binding on those who did execute only in the event of its execution by all.

For such a purpose it is clear that such evidence is admissible. Its object and design, as well as effect, do not contravene the rule excluding parol evidence from varying the terms of a written contract. It was to show that the instrument was incompletely executed; never had any existence as a deed, not to alter the meaning of a single sentence, or add or take away a single provision.

Who were to sign it did not appear, except by those who did. On its face, it does not declare who were to sign it. That may be proved by parol.

Nor is it necessary, to support this defence, to show that the complainants were parties consenting to such an agreement. If those who signed it limited the power of the agent who procured the signatures to deliver it, by declaring that they would not be bound unless all signed, it makes no difference whether the agent ever communicated that limitation to the complainants or not. No principle of law is better settled than that one who claims through a special agent takes the risk of his want of power. It does not appear, by the evidence, who handed the instrument to the complainants, nor how they came into possession of it.

It would seem, by the minutes of the company, to have been in some way considered as in custody of the company. The minutes of February 23d, 1835, say that a new bond was presented by the secretary, for the purpose of effecting the aforesaid loan, signed by a number of the stockholders. John Black and Benjamin Jones undertook to effect the said loan in conjunction with Joseph Smith, and to report at next meeting. At the next meeting, John Black reported the loan in Philadelphia had been made, and the money ready. Neither of these minutes speak of the transfer of the covenant or bond and mortgage to Black, Smith, and Jones. This fact renders it unnecessary to decide whether, if an agent of

the defendants, with instructions not to deliver unless the signatures were all obtained, had delivered it without making the limited character of his power known to the complainants, and they had taken it in good faith without notice, the defendants would have been held. No such delivery is shown, and in consequence the complainants cannot claim the protection of *bona fide* holders of such an instrument. All this assumes the execution upon condition by all who did execute; for that essentially alters the position of the case upon the point, who is to take the burthen of proof, the plaintiffs of actual transfer, as a complete instrument, or the defendants, of the negative?

In considering the last question, upon which the decision of this case turns, whether the instrument was ever executed by all those who were to execute it, and therefore capable of delivery, it is not my object to attempt to exhaust the evidence in framing an argument to show that it never was so executed, and to answer the able and ingenious arguments of the appellants' counsel. In attempting so to do, perhaps I should satisfy neither them or myself. I wish to give some of the reasons in the general, rather than in detail, for the vote which I shall give for affirming the decree.

Waiving, for the present at least, the effect of the verdict of the jury, I have come to the conclusion that the instrument was never executed by all who were to execute it; that some, at least, executed under the express condition that all the stockholders were to do so; that the covenant is joint and entire, and if the instrument is null as to some, it is so as to all.

1. The allegation of defendants' answer, that before the covenant was executed by any, there was an agreement as to who should execute it, and that it was to be by all, is in the highest degree probable.

I cannot believe that those who had an inconsiderable interest in the stock of the company would ever agree to guaranty the payment of so large a sum as $35,000, to be

paid by them equally, unless they knew who were to be jointly bound with them; and if some were willing to do so, that all those who signed were willing. I have equal difficulty in believing that the complainants would be willing to take the guaranty of any number, no matter how small. There must have been, from the very nature of the case, a preliminary agreement fixing who should sign and be bound.

The complainants have no answer to make to the question, who made the agreement to be bound by signing such a covenant? Their bill sets forth no preliminary agreement to the act of execution; they say the persons who signed, naming them, made, executed, and delivered the agreement. The allegation of their counsel and the evidence discloses no meeting at which the parties who did execute decided to sign it separate from the others, or any meeting of the subscribers at which those who signed consented that application for signatures might be suspended, and that they who had signed would undertake the whole burthen.

Their case must rest upon the simple allegation, that those who did sign, by that act, each for himself at the the time of signing, agreed alone to bear the burthen, so far as he was concerned, no matter who might refuse to share it with him. If there was no preliminary or subsequent agreement, I see no escape from this predicament.

The mode in which it was signed makes this manifest. When presented by the secretary at the meeting of the 25th of February, 1835, the minutes and the evidence both say it was signed by a number of the stockholders. It was not complete then; no one was bound, unless the act of signing bound him absolutely. A committee was appointed to carry it round, consisting of Chalkley Atkinson and Dr. Dakin, to get their signatures. Did any one except the last one, and did he even, know when it was completely executed?

The history of the execution of such a paper shows

that the very mode in which the signatures were obtained contemplated either a previous action or subsequent assent of the signers, defining the extent of their liability, so far as it depends on the number of signers.

The theory of the defendant is, to my mind, utterly incredible; business of that magnitude and importance never could have been so transacted.

2. The answer of the defendants, setting up the agreement as to parties who were to execute, is strictly responsive to the bill and evidence for them. A moment's consideration of the case will make this apparent. The bill charges that the agreement was delivered as well as executed. We have already seen that delivery means something more than mere tradition of the paper; the statement is of a full technical delivery of the instrument in a complete state, final and conclusive. If the answer admitted that, and set up matter to avoid it, such matter would be irresponsive. It does not admit any legal delivery, on the contrary denies it, without even admitting that the complainants, by any transfer, acquired the legal possession of the instrument. The facts stated show, if true, conclusively that there was no delivery, even if there was an unauthorized tradition of the paper to the complainants.

The answer does not attempt to avoid a full delivery by matter admitting it to have taken place, but by matter utterly inconsistent with any delivery. The answer is entitled to all the weight to which any answer can be entitled.

3. The evidence of Chalkley Atkinson, John Gibbs, and Thomas Haines.

Atkinson, in particular, swears, most unqualifiedly, that the agreement was to be signed by all the stockholders. He says he took the paper round, and that all to whom he applied were informed that it was to be signed by all the stockholders; that he got several to sign it. Upon this point he was not cross-examined; he

says it was the present covenant, not the one first pre-
pared. I can see no good reason for supposing that he
has confounded one paper with another, for he has signed
it himself. I do not rely upon the evidence of John
Gibbs; there is enough without it to satisfy my mind.
The testimony of William Irick is entitled to much weight;
he says that Joseph Smith told him, on one or two occa-
sions, that John Black had deceived him by signing a
bond, by stating that all the stockholders were to sign it.
This was about the time the loan was made. The evidence
of Mr. Emley, that Joseph Smith complained to him of John
Black; that he came to him with the bond, stating that
the rest were to sign it also, and that he signed it; also
he complained that the rest had not signed.

This shows not only the agreement, but that one of the
complainants knew it at the time, and that he and Black
were parties to it.

The signing of the paper was not a corporate act; it
could not, nor was intended to bind the corporators as
such. For this reason, I think the minutes of the com-
pany are not competent evidence of any agreement made
by the stockholders as individuals, and not intended to
bind the corporation. They could not bind all to sign by
any resolution, nor exempt any by the same mode. What
took place at these meetings must be proved orally, and
then can affect only those present and consenting.

The evidence, or the outlines of it, as given in the re-
port of Justice Potts, is not before us, except collaterally,
to be used in determining what weight is to be given to
the verdict. It was not before the Chancellor as evidence
in the cause upon the final hearing.

Among the many arguments pressed with great power
by the counsel of the appellants, I was at first inclined to
attach much importance to the fact, that the complainants
had advanced the money, and must have done so on the
faith of the covenant, and that this was persuasive evi-

dence that it had been duly executed and delivered. I am now satisfied that it is not of much probative force.

The complainants may have supposed that a covenant, executed under the circumstances disclosed by the evidence, bound the parties acting upon the legal principles asserted by their counsel upon the argument, or they may have believed, what the evidence shows they stated to some of the stockholders to induce them to sign it, that the property and resources of the company were sufficient to indemnify them for the advance. It is charity to suppose they believed what they stated to some of the minor stockholders. Nor do I attach much importance to the phraseology of the covenant at its commencement, when defining the parties, nor to the difference between the old and new agreement in verbiage and provisions. I mention these merely to show that I have not failed to consider them.

As I have come to my conclusion in this case without relying upon the verdict of the jury, it is not necessary that I should express any opinion upon the questions pertaining to that issue discussed so earnestly by counsel. I entirely concur in the view expressed by the Chancellor as to the power of the court to award such an issue as to its control over the framing of it, as to the admission of evidence upon the trial. It is the exclusive province of the Chancellor to determine what evidence shall be read, and what not. It is the law of the court, on an application for a new trial, and the effect of the verdict when rendered, that he may decide in accordance with it or against the finding. The whole object of such an issue is to inform the conscience of the court. His action on that issue and the finding was a matter resting entirely in discretion, and not subject to review in the appellate court. This court possesses no power to award such an issue, or to reverse the proceedings and remand the cause with any such directions; our duty is to rehear the case upon the evidence and proceedings, as they stood before hearing,

unless he refused to admit legal evidence to be taken. If illegal evidence was heard by him, he must overrule it here; if legal evidence was overruled, we must hear it, if the witness has been examined and the depositions are here.

But if we had the power to review the exercise of his discretion in refusing a new trial, it was exercised rightly by him. The main reason assigned for a new trial was, that the issues were not properly made up. I think they were, for the reasons assigned by him.

And that the evidence of John Black was not received. As the issue was made up to get the opinion of a jury upon the case as it stood before him, he could have directed that it should be heard upon the evidence as it appeared in the depositions, and have prohibited the introduction of other testimony. Black had not been offered as a witness before him or examined when he heard the cause. It was discretionary with him to permit him to be examined or not, when offered, after he had himself rested his cause in chancery, and asked the opinion of the court upon the evidence as it stood. He was a competent witness in the Court of Chancery under the act of 1855, Nix. Dig. 887: I have shown that the answer was responsive to the bill.

The proceeding before Justice Potts at the Burlington circuit, as appeared by the record, was strictly *legal* in form; it was a common law issue, to be tried according to the rules of law, except where otherwise ordered by the Chancellor. Nor was it of an equitable character in substance. No equitable relief was sought by it. It was not so either in form or substance. It is a complete confusion of terms to call it a proceeding of an equitable nature. How can a suit be of an equitable nature which is so neither in form or substance? It was ordered by a court of equity; but nevertheless it was a trial at law. The statute was passed to permit a complainant or petitioner, when suing as such in the suit or proceeding in which he

appeared as such, to be sworn as a witness in a certain case. It was not designed to control the trial of a feigned issue: that is a proceeding which the legislature have not regulated; it is the creation of a court of equity. No statute should be held to apply to it, unless it does so in express terms.

It is of great importance to preserve the power of the court over such an issue untrammelled. The suit was neither equitable in form, in substance, or effect. It was not by bill or petition. It was in form an action for a wager; no equitable relief was asked by it; the verdict, when rendered, was nothing but a finding that the plaintiff had not made out his assertions, and had lost the money wagered—was not entitled to the $200. The effect of it was not to grant any equitable relief—it was mere evidence on the final hearing.

I am fortified in my conclusion in this case by the finding of the jury. They had before them more evidence favorable to the complainants than the Chancellor had on the final hearing. No corruption or partiality was charged against them. It is the opinion of twelve unbiased men, *omni exceptione majores*, upon the very question presented for decision. It is entitled to consideration, and in a case of doubt ought to turn the scale already inclined against the complainants, though the evidence should not thoroughly satisfy our minds. The more I see of juries and their verdicts the more I am satisfied that it is the best mode of determining disputed facts ever devised by the wit of man. I mean, of course, where the jury act as fair men, uninfluenced by passion or prejudice.

The verdict is the average judgment of twelve men on the disputed point. One mind is apt to go astray in its conclusions, unless checked and moderated by the views of some other, who looks at the question from another station seeing it in another light, and having attended to another part of the subject perhaps overlooked by the other. Again, this case was three times laboriously

argued on the merits before the Chancellor, and carefully considered by him. Although this is a court of appeal upon the whole case, hearing it *de novo*, yet some respect is due to the judgment of the court below on a question of fact, at all events where the law and evidence do not clearly lead us to a contrary conclusion.

The last and least reason having any operation on my mind is, that if the decree be affirmed, the loss to be sustained by the failure of this enterprise will fall where natural justice, irrespective of the agreement of the parties, would place it—upon its principal promoters—those who, in the period of its apparent success, reaped its substantial benefits—for whom its labors were expended—whose property, large in extent and value, was, by means of it, made to yield such increased profits as to rob the final catastrophe of all its terrors, leaving them with the loss of all their expenditure in original stock and in this loan, it would seem from the evidence, not materially worse off than if they had not so invested the money. To me all these parties are strangers, and I came to the consideration of the case with no prepossessions to be removed or prejudices to be overcome, impressed with the magnitude of the stake subject to my award. I have given it a long and anxious examination, sincerely desirous to do justice according to the principles and rules controlling the action of a court of equity in the last resort; and, as the result, my mind has settled down into a firm conviction that the complainants' case cannot be supported either on the law or the evidence, and that the final decree appealed from should be affirmed.

OGDEN, J. The amount involved in this issue, the length of time which has elapsed since the bill of complaint was filed, the graveness of the questions which are presented, and the great industry and zeal displayed by counsel upon the argument before this forum of the last resort, invest the case with peculiar importance, and de-

mand for it the full and thorough investigation and consideration of the court.

The appellants, having been unsuccessful in all their previous applications for the relief sought by them, still have confidence in the justness of their claim; and they are entitled to the patient examination of their case in this ultimate tribunal uninfluenced by previous results. Their bill of complaint was filed, on the 11th of June, 1846, against parties who signed and sealed a certain covenant and the personal representatives of such of them as had died. It prayed for a discovery, from the defendants therein named, whether certain persons, on the 2d of June, 1845, were solvent and able to pay to the complainants proportionate parts of a loss and deficiency alleged in the bill to have been sustained by them through a loan which they had made to the Delaware and Atlantic Railroad Company. It charged that the defendants were liable to them for contribution by virtue of their covenant, dated the second of February, 1835; and it further prayed that an account might be taken of what was jointly due and owing to them upon the covenant, and that the defendants should be decreed to pay their respective proportions of the loss or deficiency which, according to the true intent and meaning of the covenant and upon the principles of equity, they ought to pay.

The whole merits of the case, as contended for by the complainants, rest upon the binding effect of the covenant as an executed contract, they insisting that it is available in their hands as plenary evidence of an existing agreement, entered into by those who signed it, to bear and sustain with them an equal portion of such loss and deficiency as might result from making the loan; and the defendants insisting that the paper was not to be delivered as a binding agreement until it should be signed and sealed by all the then stockholders in the Delaware and Atlantic Railroad Company; and that, as it has to it the signatures of *only twenty-one* out of thirty-seven stock-

holders, the complainants could not have become possessed of the instrument by a legal delivery of it to them as an executed contract. The final hearing was had before the Chancellor, on the 1st day of July, 1858, on the bill, answer, proofs, and the verdict of a jury, rendered upon a feigned issue, awarded by the Chancellor, on his own suggestion, to be tried in the Supreme Court by a jury of the county of Burlington, directing them to inquire and determine whether an instrument, bearing date the 2d day of February, 1835, set out in the complainants' bill, was executed by the parties thereto as their act and deed unconditionally, or upon the understanding or agreement that the same should also be executed by the remaining stockholders of the Delaware and Atlantic Railroad Company before it should be delivered as an agreement binding upon the subscribers; and whether the same ever was in point of fact legally delivered by the parties thereto, or by their authority, to the said complainants, or either of them. The response of the jury was, that the agreement was signed *conditionally*, upon the understanding and agreement that it should not be delivered as binding before it was executed by all the stockholders; and that it never was, in point of fact, legally delivered by the parties thereto, or by their authority, to the complainants, or to either of them. The Chancellor thereupon, and upon a full consideration of the whole case, ordered that the bill of complaint should be dismissed with costs.

The petition of appeal, dated February 24th, 1859, which should contain briefly the grounds of appeal, states that the appellants, complainants below, are aggrieved because the decree adopts and is founded upon the proceedings respecting the feigned issue, in which the Chancellor, in his interlocutory decree directing the issue, also directed that the bill and answer filed in the case might be read in evidence by either party, and likewise the depositions of such witnesses as had theretofore been ex-

amined, and might be dead or incapable of attending from sickness, or be out of the jurisdiction of the court at the time of the trial; and because the decree confirms the verdict of the jury and the report of the justice before whom the issue was tried at the circuit. The petition also states that the justice, on the trial at the circuit, admitted illegal, and rejected legal evidence, and charged the jury contrary to law.

It further alleges, as a grievance, that the Chancellor, on the coming in of the *postea*, refused to grant a new trial on the feigned issue; and that he also refused to grant a rehearing before himself; and, finally, that he refused to allow the complainants to be sworn or examined to disprove the allegations contained in the answer of the defendants.

Having the general grounds of appeal thus before us, it is necessary that the whole cause should be carefully examined, so that we may correctly adjudicate upon the rights of the respective parties.

The bill of complaint states the incorporation of a railroad company, at the time of filing thereof known as the Delaware and Atlantic Railroad Company, its organization, and the purpose of its creation; that the company became embarrassed from the inadequacy of their funds, which were insufficient to complete their road; and that, on the 9th of January, 1835, at a general meeting of the directors and stockholders of the company, held upon personal notice given to each one, a statement of the affairs and finances of the company was submitted to them, an examination of the state and condition of the road was made, and that it was ascertained that the company was largely indebted, and that the sum of $9772 was then estimated as a sum necessary for the purchase of rails and for other expenditures which would be required for completing the road, so as to enable it to fulfil the objects for which its construction had been undertaken, and to enable the company to derive from it a revenue.

2 R*

The bill proceeds to state that the persons there assembled resolved that the company should borrow the sum of $35,000, which sum appeared to be necessary for discharging their indebtedness and for completing the road; and that one Chalkley Atkinson, with John Black and Benjamin Jones (two of the complainants) were appointed a committee to negotiate the loan for and on the credit of the company, who subsequently, on the 23d of January, reported to a second general meeting of directors and stockholders that their efforts had proved utterly unavailing; that at this crisis in the affairs of the company, the complainants were induced, by the offer of the bond and mortgage of the company, and especially by the offer of the covenant or agreement therein after set forth, to borrow on their own credit, and to lend and advance to the company, as a loan to and for their use, the sum of $35,000; that the bond of the company, bearing date the second day of February, 1835, in the penal sum of $70,000 was duly executed and delivered to the complainants for the payment of the said loan in five years from date, with interest payable half-yearly; and that a mortgage to secure the payment of the bond was also delivered by the company to the complainants, duly executed and conveying all the lands within the bounds of their railroad.

The bill then states, that in order to indemnify the complainants against more than a proportionate part of any loss that might arise in consequence of the mortgaged property proving insufficient to pay the said debt, and in consequence of an agreement to that effect made previous to the complainants consenting to loan the money, which mainly induced them to make the loan, the defendants named in the bill and those whom some of them represent, together with the complainants, all being stockholders in the company, did make, execute, enter into, and deliver a certain covenant or agreement, bearing date the 2d of February, 1835, as follows, reciting the instrument in writing in words, &c., and that it was on

the faith and security of the said covenant that the complainants were induced to make the loan, and without it that said loan could not have been obtained from them.

It is further set forth in the bill, that on the second day of June, one thousand eight hundred and forty-five, after deducting the avails of a sale of the mortgaged property, and all the dividends, proceeds, and profits of the road which came to the hands of the complainants, there remained a balance of $54,552.89, for principal and interest due and payable to them, as a loss and deficiency upon the sum loaned by them to the company.

The bill, as amended, charges, that on the said second day of June, 1845, when the loss and deficiency were ascertained, the parties to the covenant, other than the complainants, who then remained solvent and able to pay, and the estates of such other parties who had died, which then remained solvent, became and were then, and at the time of filing the bill, liable and bound to bear and sustain the loss and deficiency equally with the complainants, or some part thereof.

The equity of the bill is put on the ground that the solvency or insolvency of the surviving parties to the instrument, and of the estates of such of them as were deceased, and their ability to pay their respective proportions of the loss and deficiency, was a fact almost always exclusively in the knowledge of the party himself or of the personal representatives of his estate, and was not capable of proof by another without a discovery from the parties themselves, severally and respectively, and from the representatives, respectively, of such as were dead, and also on the ground that the complainants being likewise covenantors, parties in the instrument, could not sustain an action at law upon it.

The defendants, in their answer, admit the incorporation and organization of the Delaware and Atlantic Railroad Company and their financial embarrassments; they also admit the several general meetings of the directors

and stockholders, and that it was resolved to make a. loan of money to the amount of $35,000, and that the persons named in the bill as a committee reported that the money could not be procured on the security of the road. They state, as an extract from the minutes of a meeting of the stockholders, held on the 23d day of January, 1835, "that it was resolved, and agreed by the stockholders, that John Black, Joseph Smith, and Benjamin Jones do, by their joint obligations, get the sum of $35,000; and that they have a mortgage on the road delivered to them; and that the *remaining stockholders* execute a joint bond to the said persons so loaning the money, as security to them in case of any losses sustained by said loan, each one to bear his proportion of the loss." It is further stated, in the answer, that on the 2d of February, the mortgage, bond, and covenant were reported to a meeting for examination, and were sanctioned and adopted; that the bond and mortgage were then executed and delivered; but that the covenant to indemnify was not then executed and delivered by the stockholders of the company, a part of whom only were present at the meeting; that at a subsequent day or days, a covenant of the general tenor and effect of the one set out in the bill, dated the second of February, was executed by the persons stated in the bill.

The defendants then answering, each severally for himself, say that, as well at the time of the passage and of the entry in the minutes of the resolution for the execution of the covenant and agreement, as at the time of the execution thereof, it was expressly understood and agreed, by and between the parties thereto, that the same was to be executed by *all* the stockholders of the company, and that it was not to be obligatory and binding on such as did execute until it was so executed by the other stockholders, and that the complainants were cognizant of and parties to the agreement; and they aver, in their answer, that the said covenant to indemnify never

was and never could have been delivered as a binding agreement until the other stockholders executed the same; that in point of fact, only twenty-one out of thirty-seven stockholders executed it, and those not at one time, but at different times; and that many who did sign, as well as those who refused to sign, were urged to execute it on the special ground that it was to be only binding on those who did execute it in the event of its execution by all.

The defendant, John Chambers, the holder of forty shares of the stock, in the answer says, that he objected and utterly refused to execute the paper, until he was told by John Black, one of the complainants, that all were to execute it; and that he never would have executed it but for such representation. And the defendants, in their answer, insist that the attempt to enforce the agreement against them, being a part only of the stockholders, is unjust and fraudulent, and that the agreement is not in law or equity binding upon any of them, but as to them is utterly void and of no effect.

If the question was placed on the bill and answers alone, the whole case of the complainants would necessarily fall, because the answers directly contradict the most material allegation of the bill, to wit, that the covenant to indemnify was entered into and was delivered to the complainants as a subsisting agreement.

The fact of its being in the custody of one of them could not shake the evidence furnished by the answers, inasmuch as, being covenanting parties to it themselves by their signatures and seals, they would have as much right to hold it until perfected as any one of the defendants would have. The complainants, by their replication, put all the allegations of the answers in issue, and some thirty-five witnesses were sworn and examined by the parties.

The cause was first argued before the Chancellor, in the term of February, 1856, upon the bill, answers, depo-

sitions, and proofs; and having taken time for examination of the case, and advisement until the 26th day of November following, the Chancellor then directed the feigned issue to be formed in the Supreme Court to try and determine upon the validity of the covenant as an existing binding agreement, whether the execution of the instrument was consummated by delivery.

At this point of the case the appellants complain of the Chancellor, and say that he had no right to transfer the settlement of that question of fact to a jury. The practice of the court has always been, in the exercise of its discretion, if it thinks the rights of the parties can thereby be more certainly and satisfactorily settled, to direct a strongly controverted matter of fact to be tried in a court of common law by a jury. In some instances it has been done on the application of a party, and in others on the mere motion of the court, in order to relieve its own conscience and to be satisfied by the verdict of a jury of the truth or falsehood of the facts controverted.

The power is given in this state by legislation, found in *Nixon*, *p*. 92, § 44, and it has been recognised in several instances here, and also in other states. 1 *Saxton* 206, *Miller and Stiger* v. *Wack et al.*; 1 *Green's Ch.* 132, *Trenton Banking Company* v. *Woodruff et al.*; 1 *Johns. Cases* 436, *Le Guen* v. *Governeur and Kemble*, 6 *Johns. Ch.* 255; 4 *Blachford* 116, *Kay* v. *Doughty*.

Although the power exists in the court, its discretion on the subject should be sparingly exercised. It seems to me that the agency of a jury was eminently proper in the case before us. As already stated, the whole merits depend upon questions of fact.

If the rights of the parties, as to the ratio of contribution which would result from the due execution and delivery of the covenant, could have been adjusted and secured without the aid of equity, a common law court would have been the appropriate tribunal for settling the whole case; and hence the Chancellor acted wisely in re-

ferring to a jury the finding of these important controlling facts, whether or not the paper was signed and sealed unconditionally, and whether it ever was legally delivered by the parties thereto to the complainants before he attempted to grant the relief prayed for in the bill of complaint.

A concise summary of the practice which regulates the power and discretion of the court in calling in the aid of a common law tribunal, to obtain its opinion on a matter of fact, will be useful in testing the validity of the remaining objections to the proceedings which were had in this case.

The manner of the proceeding is entirely under the control of the court of equity. It will often, by its order, suspend certain of the rules of evidence for the purpose of affording facilities for the trial of the issue. It frequently will direct the examination of one or more of the parties to the suit. It also will direct that the parties be at liberty to read the depositions taken in the cause of such of the witnesses as, upon the trial, shall be proved to be dead or unable to attend to be examined. As the whole proceeding takes place for the purpose of informing the conscience of the court, it is not bound down *strictly* to the forms and incidents of a regular common law trial. After the *postea* has been returned, the Chancellor, if he thinks fit, may make no use whatever of the verdict, but may treat it as a mere nullity. *Gresley's Equity Evidence*, from page 401 to 405.

So also in 2 *Daniel's Chancery Practice* 987. In ordering the trial of a question of fact at law, that court is not left to proceed entirely on its own rules of evidence, but rules in equity are frequently introduced. This is done by the Chancellor ordering the answer of a defendant to be read as evidence upon the trial of the issue, for the purpose of allowing the defendant to have it contrasted with the evidence of the witnesses.

In *Marston* v. *Brackett*, 9 *N. Hamp. R.* 350, it was held

that the manner of proceeding to the trial of issues from chancery is under the control of that court. If, after the evidence has been taken for the hearing, the party moves for a trial by jury, the case should be tried there upon the same evidence on which it would have been tried had it been examined before the the Chancellor, unless, upon cause shown, he makes an order permitting further evidence to be introduced.

2 *Daniels* 1297.—The court directs the trial in such a way that all productions shall be made which it conceives to be useful on that trial—*the creature of its own direction*—and it may impose such restrictions on the parties as will prevent all fraud and surprise on the trial. Again, p. 1300, the course of proceeding upon the trial of the issue is generally the same as that adopted in ordinary trials at law, except where the Court of Chancery has given any special directions on the subject. It is merely a judicial proceeding to inform the conscience of the court. Page 1306.—There is a material difference between courts of law and courts of equity in the rules by which they are guided in granting new trials. The general principle acted on by a court of equity is, that if the application rests solely on the ground that the verdict was against the weight of evidence, and the judge states that, upon the whole, he was not dissatisfied with it, the court will *not* direct a new trial. Same, p. 1310.—A new trial may be directed on the ground of a misdirection of the jury by the judge, or because evidence which was offered was improperly rejected, *unless* the court is satisfied that the verdict is right, considering all the evidence, including that which was rejected.

In 5 *Johns. Ch.* 148, *Van Alst et al.* v. *Hunter et al.*, it rests entirely in the discretion of the Chancellor to award a new trial or not, according to the circumstances and testimony in the case.

It was objected, on the argument, that the Chancellor should have set the verdict aside, and have ordered a new

trial at law, because the judge at the circuit admitted illegal evidence, and rejected legal evidence, and charged the jury contrary to law. Upon a careful examination of the charge of the judge, I do not find that he stated any principle of law whatever to which the plaintiffs could object, unless it was in his direction to the jury, that the evidence before them had not made a case which comes within the rule; that if a deed absolute on its face be delivered by the grantor to the grantee, it takes effect at once as an absolute deed, and cannot be avoided by parol proof of a condition precedent unperformed. There certainly is no error in this. It was not insisted on by the defendants, that although the instrument was delivered by them to the plaintiffs, its efficacy as an absolute deed depended upon the performance of a condition; but their whole defence rested on the contention that the covenant had never been completed nor delivered, and hence that it was of no vitality in the hands of the plaintiffs.

This direction of the judge also involves the legality of his rulings upon the admission of evidence, which was objected to by the plaintiffs. He admitted parol testimony to show the facts by which the defendants sought to overcome the *prima facie* case made by the plaintiffs, in their having the covenant absolute on its face in their possession. That testimony did not tend to contradict the written instrument, but it was introduced to show that the paper could not have come into the hands of the plaintiffs by a delivery from the defendants, or any of them, as an executed covenant. The view which is taken by the Chancellor of this matter, in his opinion, is clear and conclusive, and he is fully sustained by the authorities quoted. It will be sufficient in this place to cite the cases without a further statement of the rulings. 6 *English Com. Law* 479, *Johnson et al.* v. *Baker;* 1 *Wend.* 478, *Roberts* v. *Jackson;* 7 *Peters* 435, *Duncan's heirs* v. *U. S.;* 11 *Peters* 86, *U. States* v. *Jacob and others;* 3 *Green* 155, *State Bank* v. *Evans.* So likewise 1 *Greenl. Ev.* § 284.

The judge committed no error in admitting that character of testimony, nor did he err in his instructions as to the effect of a responsive answer as evidence for a defendant. It is a fixed principle in the administration of equity jurisprudence that the defendant is entitled to the benefit of his answer as testimony; and such portions of it as are responsive to the allegations of the bill, and do not set up new matter, must be overcome by the oaths of two credible witnesses, or of one witness confirmed by strong corroborative circumstances.

In thus instructing the jury, telling them, in addition, that the weight of that piece of evidence was exclusively for their consideration, he did no injustice to the complainants. Several objections were made at the trial to the introduction of the written testimony of John Gibbs, taken in the examination of witnesses in chancery. It was contended that, as the second, third, and fourth questions and answers were objected to before the examiner, the judge should exclude them from the consideration of the jury. The introduction of the deposition as evidence was done by an order of the Court of Chancery. That order was made with the knowledge of both of the solicitors of the parties. The testimony had been read and used on the hearing before the feigned issue was directed.

If the counsel desired the decision of the examiner to be reviewed, the proper time for calling attention to the subject was on the hearing before the Chancellor, in February, 1856, or, at farthest, when the order for the issue was made. The Chancellor ordered that certain testimony, taken in the usual course of proceedings in the court, should be read on a trial at law, (which trial was a creature of his own direction) and it would have been wrong for the judge at the circuit to have questioned the legality of the testimony which the Court of Chancery had directed him to submit to the jury. It must be assumed that the Chancellor had passed in his own mind upon the legality of the testimony of Mr. Gibbs before he

directed that, as an entirety, it *should* be laid before the jury, in case the witness should be incapable, through sickness, from attending at the time of the trial, or be then out of the jurisdiction of the court.

It was also objected that the book in which the minutes of the proceedings of the stockholders were entered was improperly admitted as competent testimony before the jury.

The proceedings of the stockholders, when convened, were entered by the secretary in the book wherein the record of the meetings of the directors was kept, and the authenticity of the book was established by several witnesses. It appeared in evidence that the minutes thus kept were read at the meetings of the stockholders and were approved by them; and certainly they were competent testimony to confirm the recollections of the defendants and witnesses as to the deliberations and conclusions of the persons who were in conference with John Black and Joseph Smith on the several occasions when the subject of the covenant was discussed. They were not read for the purpose of binding absent stockholders to the performance of an act resolved on by their co-stockholders, but merely to throw light upon the question of general intent, when the indemnity was talked about, and its extent was determined upon.

The complainants state, in their bill, that meetings of the stockholders took place, and that it was resolved and determined on by them at their meetings to take action for the relief of the company. The book of minutes received in evidence shows the several meetings to which reference is made in the bill of complaint, but it also shows that the instrument of indemnity was to be executed by all the stockholders. The resolution of those persons, thus convened, could not bind the absent stockholders to put their names to the proposed paper, but it is expressive of the condition upon which those who made the proposition, that the money should be procured by

the complainants would become personally responsible to them.

The judge instructed the jury that it was within their province to determine how far the minutes produced had been proved to be a correct record of what occurred at the several meetings of the stockholders, and that they should give such weight to the book as they might think, upon the evidence connected with it, that it was entitled to receive. There was no error in the admission of that testimony.

The appellants further complain, that the judge refused to permit John Black, one of the complainants, to be sworn before the jury. It appears in the printed case before us, that on the coming in of the *postea*, the judge furnished the Chancellor with his minutes of the proceedings of the trial, showing the order in which the testimony was offered and read by the counsel for the respective parties, and accompanied with his certificate, that although the case was not free from difficulty, yet on the whole he was satisfied with the verdict.

Those notes show that the bill of complaint and the answer were read in defence on the first day of the trial, and that, on the third day, after all the testimony was in before the jury, Mr. Black was offered as a witness, not generally, but to disprove the allegations of the answers which had been read. The admissibility of the party as a witness rests upon the second section of an act of the legislature, which was approved on the 5th of April, 1855, and went into effect on the 4th of July. The first section of the act provides that interest in the event of an action or proceeding shall only affect the credit of a witness, not his competence; and, in the next section, it is enacted that the first section shall not be so construed as to render a party to an action or proceeding competent to testify in his own behalf; "provided, however, that the complainant or petitioner in an action or proceeding of an equitable nature, in any court, shall be a competent

witness to disprove so much of the defendant's answer as may be responsive to the allegations contained in the bill of complaint or petition."

It is manifest that if the proceeding had originated by an action instituted in the Supreme Court, and it had been competent to show the contents of an answer in chancery, that the plaintiff could not have been used as a witness in his own behalf. What, then, was the nature of the proceeding which was heard before Justice Potts? Was it of a legal or an equitable nature?

The circuit record, which was his authority for empannelling a jury, showed an issue of fact in the Supreme Court, affirmed on the one side, and denied on the other, without any reference to former equitable proceedings. So far as the nature of the proceeding itself was important, it was strictly of a legal character. The course of trial on such issues is generally the same as courts of law ordinarily adopt, unless the Chancellor gives some special directions for the purpose of facilitating the trial, and preventing fraud and surprise on either side. If in the present case the Chancellor had not directed the answer to be read, and the depositions of absent witnesses to be used, the judge could not have admitted them in evidence, because such proofs are unknown to a court proceeding according to the course of the common law. I am clearly of opinion that the act of 1855 was not applicable to the case, and that the judge rightly refused to permit Mr. Black to be sworn as a witness. The party cannot justly complain of the action of the judge. His right to become a witness in the original suit accrued on the fourth of July, 1855. He made no application to the Chancellor for extending the rule to close the testimony, so that he might be examined. The case went to a final hearing upon the bill, answers, and proofs on the first of February, 1856, and in November the feigned issue was ordered; yet no suggestion was made, that the testimony of Mr. Black was important for contradicting the re-

2 s*

sponses of the answers. When the Chancellor ordered that the answer should be read before the jury, an application could have been made to him to allow Mr. Black to be sworn to disprove the same. If he is possessed of valuable knowledge which would discredit the answers, he should have made the fact known at an earlier stage of the proceedings; and, perhaps, by so doing he might have saved the delay and expense incident to the feigned issue. It could not have been the intention of the legislature, in thus infringing upon the rules and practice in equity jurisprudence, to arm a complainant with a concealed weapon, with which, at the close of a conflict, he might prostrate his adversary. Such was the view of the Chancellor; and to prevent an abuse of the act, he made a rule in his court, on the 1st of July, 1858, that a complainant or petitioner, who desired to avail himself of the act, should be sworn and examined as a witness within twenty days after issue joined, and before any other witness should be examined in the cause.

The refusal of the Chancellor to order a new trial, because one of the subscribing witnesses had returned from an European tour since the rendition of the verdict, cannot furnish a substantial reason for reversing the final decree. He is not a newly discovered witness; his absence was not presented as a reason for postponing the trial at the circuit; and we would override the well defined rules which prescribe the bounds between exact law and equitable discretion, if we should allow that cause to influence our decision.

While I am not prepared to say that the question, whether a new trial in every case of a feigned issue, is so entirely within the discretion of the Chancellor that a decree made subsequent to and in conformity with a verdict which was clearly unlawful would not be reversed on an appeal, yet I am willing to concede much to the final view which that court may take of the whole case.

We have seen that the Chancellor may disregard the

verdict altogether, and although he may have ordered an issue, he may afterwards fall back upon the case, as it was made before the issue was considered. This court, likewise, may so dispose of the case; and if it shall appear that substantial justice has been done, the irregularities and *illegalities* occurring in the court of law may be overlooked and disregarded. I have carefully and attentively examined the whole case, as it was presented to the Chancellor at the time of his making the final decree; and I am convinced by the proofs, that the paper which is the foundation of this suit was executed by the persons whose names are to it *conditionally*, and that it never was delivered by them, or with their knowledge or authority to the complainants, as a binding contract.

The decree of the Chancellor should, in my opinion, be affirmed with costs.

The following dissenting opinions were read by Judges VREDENBURGH and VAN DYKE.

VREDENBURGH, J. The sole point in this case is, whether a certain bond of indemnity, dated February 2d, 1835, and signed by both the complainants and the defendants, was, as against the defendants, legally delivered. The jury and the Chancellor have found as a fact that it was not.

The bond was made to indemnify the complainants for advancing, on or about the 9th of March, 1835, $35,000 to the Delaware and Atlantic Railroad Company.

The complainants were the proper persons to whom it should be delivered. It was produced by them at the trial. No point of time since the advance of the $35,000 to the road, in March, 1835, is shown when it was not in their possession. The bill charges, that previous to the loan the bond was delivered. The answer does not raise the question or aver that the bond, at or previous to the loan, did not come to the actual possession of the com-

plainants. I see no reason to doubt that the bond did, at or about the time of the loan, come to, and ever since has remained in the physical possession of the complainants.

But the question intended to be raised by the defendants, and which is fully raised by their answer is, that although the bond was physically, yet that it was never legally delivered. The reason assigned why it was not legally delivered is this : those who signed the bond were *part*, but not *all* the stockholders of the said railroad company. And the defendants aver that when the bond was signed by them, respectively, it was understood by all those who executed it that all the stockholders should execute it before it should be binding upon any, and that, consequently, before such execution by all, no legal delivery could take place. The difficulty is not about the physical, but about the legal delivery of the bond. If there was no such agreement, there can be no question but that the delivery was legal. If the proof of the agreement fails, the delivery is undoubtedly good.

This raises two questions :.

1. Can the defendants establish this agreement by parol proof?

2. If they can, have they done it ?.

*First.* Is it competent for the defendants to prove by parol that the bond was not to be binding on them unless all the stockholders signed it ?

The bond contains the names of none except those who have signed it, nor does it refer to the other stockholders. The complainants advanced this $35,000 upon the faith of it, and for many years the defendants stood by and quietly enjoyed its fruits. If the names of the other stockholders had been upon the face of the bond such proof would have been competent. Whether it would where they are all strangers to the face of the bond, I do not intend to express an opinion. It certainly would be of very dangerous tendency. But whatever doubt I might

have as to the competency of parol proof in case of an
ordinary bond, I have none under the peculiar language
of this one; and for this reason, that the verbal agree-
ment, which the defendants set up as existing *eo instanti*
with their respectively signing it, is in the very teeth of
the written agreement which they did sign.

The verbal agreement set up is, that none were to be
liable until all the stockholders had signed; and the bond
they did sign, by its express terms, was to be binding
upon such of the stockholders as saw fit to sign it. The
agreement between the parties might have been either
that the bond should not be binding until all had signed
it, or it might have been that it should be binding on all
who signed it, and on each one as he signed it. If nothing
had been said about it in the bond itself, it might, per-
haps, have been subject to parol proof; but if the parties
saw fit to say, in the instrument itself, which way it
should be, parol proof is excluded.

Does the instrument show upon its face that the agree-
ment was that it should be binding upon all who signed
it, and upon each one as he signed it, and exclude the
idea that it was not to be binding upon any until all the
stockholders signed it?

The bond commences as follows:

" To all to whom these presents shall come or may
concern: We, John Black, Joseph Smith, James Shreve,
Clayton Atkinson, Chalkley Atkinson, Jonathan Smith,
Timothy Field, Thomas Haines, Jonathan Scattergood,
Richard Jones, Philip R. Dakin, Thomas Black, Jacob
Ridgway, Restore S. Lamb, James Newbold, Benjamin
Jones, John B. Bispham, John Chambers, Joseph Brown,
Nathan Atkinson, A. B. Wood, stockholders in the Del-
aware and Atlantic Railroad Company, send greeting."
These are twenty-one out of the thirty-seven stockholders.

It is singular that if the understanding was that all the
stockholders were going to sign, or the bond be binding
on none, it should simply have said—We, John Black,

&c., stockholders. In so large a transaction, with so many parties, with so singular and special an agreement, would not the language have been "all" the stockholders, or at least "the" stockholders?

But, again, if the intention had been as the defendants contend, would not the names of all the stockholders have been inserted? Again, how does it happen that these names in the body of the bond are the precise names of those who have signed it? If the design had been that it was to be binding on all or none, we should have expected to find in the body of the bond the names of other stockholders as likely as those who did sign it. But if the design had been that it should be binding on those who did sign it, then all this is the natural result— then this preamble would not have said "all" or "the stockholders," but simply stockholders, and the name of each one, and no other, would have been put in this preamble as he signed it.

The bond then goes on further to state, that "whereas the Delaware and Atlantic Railroad Company borrowed of John Black, Joseph Smith, and Benjamin Jones, who are also stockholders in the said company, the sum of $35,000, to be applied toward the completion of the said road, and to secure the payment thereof, the said board have given their bond and mortgage to the said Black, Smith, and Jones; and whereas *we, whose names are hereunto subscribed and seals affixed,* have agreed with the said John Black, Joseph Smith, and Benjamin Jones, that in case the corporate property so mortgaged should fail to pay the said $35,000 and interest, so that a loss or deficiency should happen, that in that event each of us, and each of them, the said Black, Smith, and Jones, shall sustain an equal portion of such loss."

Each person, when he came to sign, is presumed to have read the instrument. There is no allegation that he did not, or that any fraud or misrepresentation was practised upon him. If he did, what did he read? Not

that "the" or "all" the stockholders had agreed to indemnify, but that we, whose names are hereunto subscribed and seals affixed, have agreed so to indemnify. By the very terms of their agreement, each one made his own signature and seal the evidence, and the only evidence, who was to be bound by the instrument. They said, in express terms, that not all the stockholders, but those who signed and sealed should indemnify. In connection with the preamble, it says, we stockholders who sign and seal have agreed to indemnify. Again, in the latter part of the clause we last cited, it is said, "in case of loss, each of us shall bear an equal portion." Who are "us?" Clearly those who sign and seal.

This bond then goes on further to say: "and in the event that any of the said parties, that is, *of us who have signed these presents*, shall become insolvent, that in such case such of *us* as remain solvent shall bear such loss equally with the said Black, Smith, and Jones." Here is a distinct definition in the instrument itself who are to be the parties to the instrument—not the railroad—not the stockholders generally—but we who have signed these presents. Can we imagine that this language could have been inserted for any other reason than to preclude the possibility of such a defence as the defendants now set up? And again, "such of us as remain solvent will pay our proportion of the loss." Who are us? It is tantamount to saying again, "we whose names are subscribed" will pay.

This instrument then goes on further to state: "Now know all men by these presents, that in order to confirm the said agreement, and to give it legal operation and effect, we, *whose names are hereunto subscribed and seals affixed*, do hereby covenant, promise, grant, and agree, to and with the said Black, Smith, and Jones, that in case of loss, we will pay such sum of money as will divide said loss equally between such of us as remain solvent and the said Black, Smith, and Jones, that is to say, each

of said several individuals to bear an equal part of said loss." Confirm what agreement? Is it not the agreement that those who sign and seal the instrument had agreed to pay their portion of the loss? Again, who covenant and agree to pay their portion of the loss? Is it not by the very terms, we whose names are hereto subscribed and seals affixed? Again, "each of said several individuals to bear an equal part of said loss." Who are "said several individuals?" They certainly are not all the stockholders, but only those of them who sign and seal. It is perfectly manifest that the words, we whose names are hereto subscribed and seals affixed, so unusual, so often repeated, were inserted for the very purpose of excluding the idea that all were to sign before any became responsible, and for the very purpose of binding all who signed, and each one as he did sign, and to make the signing of each one the test of his liability in common with all who should sign. These words were used for the express purpose of contradistinguishing those of the stockholders who did sign from those who should not. And I do not see how that object could have been expressed in more explicit and emphatic terms. The language of the instrument is equivalent to saying, such of us stockholders as sign this instrument agree to pay. The language is not, we stockholders agree to pay, or "we all three the stockholders" agree to pay; but the language is, we whose names are hereto subscribed agree to pay, and such of us who have signed and remained solvent agree to pay, and each individual who has signed will bear his proportion of the loss.

It may be said, perhaps, that there might nevertheless have been a parol agreement that those who did sign should not pay unless all should sign; but such parol contract would be in direct contradiction to the written instrument. A parol agreement, that the instrument is not to be binding until all the stockholders sign, cannot coexist with an agreement in the words, we whose names

are hereto subscribed agree to pay, because, by this last language, they agree to pay if they sign. By the express terms of the instrument, they make their liability to pay depend upon their signing.

I am of opinion that the defendants, by the very terms of their written contract, have precluded themselves from proving by parol that they were not to be bound unless all the stockholders signed. But suppose said evidence was legal, the next inquiry is, have the defendants proved that when they signed it was agreed that none were to be liable unless all the stockholders signed. This would depend upon the proof.

Note.—Judge Vredenburgh then considers at great length the weight of the evidence upon this question, which, at his request, is omitted.

Van Dyke, J. This is a proceeding, instituted by the complainants in the Court of Chancery, to compel a contribution on the part of the defendants, based on a special agreement signed by all the parties, in which it is alleged the defendants bound themselves to indemnify the complainants against loss, which loss it is said has occurred. It seems to be admitted that the Court of Chancery is the proper tribunal in which to seek relief, if the complainants are entitled to it anywhere. The signing and sealing of the agreement is admitted by the defendants; but they set up and insist that the execution of the paper was a conditional execution, which condition was never performed or complied with, and that the instrument was never in fact delivered to the complainants by the defendants, or with their consent, as a binding agreement between them.

The bill of complaint was amended, and so was the answer; and although there were several grave questions started in the pleadings, they were not pursued either in the evidence or in the arguments of counsel, and the

entire controversy is narrowed down to the simple questions, whether the agreement was in fact executed absolutely or conditionally, and whether the said agreement was in fact ever lawfully delivered by the defendants, or with their consent, to the complainants or either of them. After the evidence was closed, and the matters argued before the Chancellor, he was so much in doubt as to where the truth and justice of the case lay, that he ordered a feigned issue to be made between the parties, and the disputed facts before mentioned to be submitted to a jury before the Circuit Court of the county of Burlington. The trial was had, and the jury found the issues thus made in favor of the defendants. The Chancellor, although applied to for that purpose, refused to set the verdict aside or to grant a new trial or a rehearing of the case, but made his decree in favor of the defendants, in conformity with the finding of the jury. From this decree an appeal has been taken, and the matters are now before this court for consideration and review. If the case had been heard and decided by the Chancellor on the pleadings and proofs before him in the ordinary way, without the intervention of a jury, and if it were now before us for review in the same condition, I should feel less embarrassment as to my duty in regard to it. That grave errors occurred before the jury, and in connection with the reference to them, such as this court should not sanction, and such as a court of law should set a verdict aside upon, I do not doubt. But whether this court may properly disregard these errors, and treat the verdict of the jury and all the matters connected therewith as a mere nullity, as though they had never occurred, and proceed to affirm, reverse, or alter the decree of the Chancellor as we may think just and equitable, without any regard to the verdict of the jury, when we are satisfied that such errors have occurred, is an important question, lying at the threshold of this inquiry, and one which should receive the careful answer of this court. If we are bound to ex-

amine the verdict of the jury, and the proceedings on which it is based, and if found to be clearly wrong, to revise the decree founded upon them for that reason, then we need not trouble ourselves with the merits of the case; but if, on the other hand, we may and ought to disregard the verdict of the jury, and all the proceedings on which it is based, however erroneous, absurd, or monstrous they may have been, then we may properly dismiss from consideration all that part of the inquiry, and pass at once to what we may consider the merits of the case upon the pleading and evidence as they are before us.

The difficulty of solving the important questions of fact were so great in the Chancellor's mind that he sought the aid of a court and jury in the premises. He obtained that aid. He received the verdict of the jury with the rulings and decisions of the court upon the trial. He adopted that verdict and these rulings as lawful and right, and based his decree upon them. Although the case was three times elaborately argued before him, the only opinion which he delivered confines itself to a justification of his reference of the case to a jury, and to a justification of the trial with all its incidents, vindicating at length his reference of the case and the issue found, as well as the decision of the court and the finding of the jury from all the complaints made against them, but enters into no argument whatever, or reference to the pleading or proofs, to sustain the decree which he made independently of the verdict of the jury. I do not object to these things, but refer to them to show that the Chancellor's decree was based greatly, if not wholly, on the trial and verdict. If, then, we find the decree of dismissal in this case, which we are asked to affirm, resting almost, if not quite, exclusively on the trial and verdict, and if we find the proceedings which included this trial and verdict filled with grave and serious errors, how can we affirm that decree with these errors patent upon the proceedings without seeming to affirm these errors ?

I do not deny the right of the Chancellor to make up a feigned issue, and seek the aid of a jury in his efforts to solve it, nor do I think that he has exercised that right improperly in this case. I admit his right to determine the principles on which the trial is to be conducted, the evidence to be used, the rules of law or equity to be applied, and that he may adopt or wholly reject the verdict when rendered; but if in doing this he commits any grave and serious errors, or if the court or jury, either by or without such directions, commit any such errors, which clearly affect the rights, and as clearly destroy the interests of a party; and if the Chancellor, either before or after the verdict, makes or adopts these errors as his own, and bases his final decree upon them, without any repudiation of them whatever, it is certainly, I think, not only our right, but our duty, on appeal to us to correct such errors, if injustice has been done thereby; nor is the large discretionary powers of the Chancellor any answer to this proposition. His discretion is considered to be large; but in the exercise of his discretion, however great, he has no legal right whatever to do wrong: nor can I admit that he can commit any error, in the exercise of his discretion or otherwise, which this court has not the power to correct. Courts of law, it is said, have the discretion to make blunders and commit mistakes which cannot be corrected on a writ of error; but even the discretion of law courts cannot shield their errors from review on a motion' for a new trial when the whole case is open for examination. So here we have the whole case under review—all the pleadings, all the evidence, all the orders and decisions, verdict and final decree—and if in any one of them, or in any part of them, we can find an error that has wrought injustice or deprived the party of a clear and undoubted right, which results in his injury, it is not only our right, but our imperative duty to make the correction.

As before remarked, the Chancellor, in his final decree,

Black *v.* Shreve.

the reasons for which are to be found in his written opinion, puts it, as I understand it, entirely on the verdict of the jury, which verdict, and the proceedings on which it was based, he defends and justifies in all their length and breadth, and places it on no other grounds. And yet that verdict and these pleadings are, in my opinion, so erroneous that I could not consent to let them stand as the law of the land, even if it were possible, in a legal way, to do justice between the parties by an entire disregard of the trial and all its incidents. But this I apprehend we cannot do; and hence I feel a greater necessity of reversing this decree on the ground of its being based on an erroneous verdict, to the end that that verdict may be set aside and a new trial had upon correct principles, or the cause heard in some other way, according to the well known principles of equity proceedings.

The Chancellor ordered the pleadings in this case to be read in evidence by either party before the jury, and this is complained of because the order, in this respect, was without discrimination or qualification. I do not think the order of itself is objectionable, and if it had been properly carried out at the trial, I should not feel at liberty to disturb the verdict on account of the form of the order; but these pleadings were so treated and used at the trial as to do great injustice to the complainants. We cannot suppose that the jury had any knowledge or correct notion of the force and effect of either a bill or an answer. The bill was not sworn to by any one, while the answer seemed to be proved by some half a dozen persons. The result of this state of things would naturally be, if not explained, that the jury would give full credit to the answer, and none whatever to the bill. And in point of fact, although the bill was read to the jury, the judge wholly failed to instruct them that it contained anything whatever to which they might or should give any heed, while he did in fact instruct them that the answer was to be received and treated as evidence,

2 T*

whether it was responsive to the bill or not.   This was a most serious error, for, under such a charge, the jury would have been fully justified, if not required, to find the verdict as they did, without looking at any other evidence, and perhaps in defiance of it.   Now we all know that a bill is just as much evidence, and quite as potent in a case as the answer.   All the material matters in the bill that are not denied in the answer, if there be one, are to be taken as true, while nothing in the answer which is denied by a replication is to be taken as true, except what is really in answer to some statement or charge in the bill.   Yet of this rule, so necessary and so absolute in chancery proceedings, the jury were not only left in profound ignorance of, but, so far as they were instructed at all, they were charged to give full force to the answer in all its parts, while they were left at full liberty to treat the bill as of no force at all.   The judge was doubtless aware of the rule referred to, but through inadvertence did not give it to the jury in such way as to enable them to make a proper use of it; but, on the contrary, the charge was such as to enable, if not to require the jury to use the pleadings in a manner clearly opposite to that which the law requires.   This is an error well calculated to do mischief, and one which this court ought not to affirm.

The complainants object to the verdict on the ground of the rejection of competent evidence at the trial.   They offered as a witness John Black, who is himself one of the complainants in the suit.   He was objected to on the ground that he was not a competent witness, and the objection was sustained.   If John Black was a competent witness, then the rejection of his evidence was not only a grave error, but is one which we cannot possibly correct but by reversing this decree.   If his evidence is competent, we are bound to consider it as material and important.   He might have proved, for aught we know, that all the parties who signed the agreement, in a body, agreed

to waive the necessity of having the names of all the stockholders to the paper, and agreed to make it absolute in its then condition, and that in fact they, in their proper persons, delivered it without condition to the complainants. But however important his testimony might have been, it was not before the jury nor before the Chancellor, nor is it before us, nor can we take any notice of it; and if we affirm this decree in its present condition, we must for ever deprive the complainants of the benefit of this evidence. The only way in which the wrong, if it be one, can be corrected is by reversing the decree setting aside the verdict of the jury, and opening the case anew to such evidence as may be competent.

If the evidence of John Black was properly rejected, it must have been because it was incompetent; and if it was incompetent at the time it was offered, it might have been because it was offered in an action, a proceeding not of an equitable nature. It could not have been rejected on the ground that there was nothing in the defendants' answer to disprove that was responsive to the bill. The defendants will hardly insist on this, nor could it have been rejected for the reason that the evidence between the parties had been closed; for the reference of the case to the jury completely reopened the controversy to the introduction of all legal testimony, without regard to the question, whether the witness had, or might have been examined before the master or not; and this applied as well to the parties themselves as to any others, if their evidence was competent in itself.

Whether, then, the testimony of John Black was properly or improperly rejected depends upon the question, whether the action or proceeding in which it was offered was one of an equitable nature. I am forced to look upon it in this light, and cannot see it in any other. The suit is in the Court of Chancery, and is of an equitable nature. The proceedings up to the time of the reference were all of an equitable nature, and all those proceedings

were transferred, by the Chancellor's order, to the Circuit Court and jury, to be proceeded in by them under his express directions. This reference to a court of law and a jury was not at the request of either party, but at the instance of the Chancellor himself, who sought the aid, not so much of a court of law on important legal questions, as the aid of a jury in the solution of important and perplexing facts. If he had needed the aid of the law judges, he could have obtained it without the intervention of a jury; and when he received it, if he adopted it, it would have been the opinion of the Chancellor, and not of the Supreme Court; but the aid of a jury he could not obtain except through the intervention of a court, but neither the court nor the jury come to any final conclusion in the matter, but the court simply reports back to the Chancellor the proceedings which have been had before him, the same substantially as if the reference had been to a master, and the proceedings in the one case, as well as in the other, when report thereof is made to the Chancellor, may either be regarded or disregarded by him, as he thinks fit; because the proceedings are his own, substantially in his own court, and under his entire control; the only thing that is peculiar about it being that, as he has no power to bring a jury into his own court, he is forced, when he needs their aid, to seek it through the only channel in which their verdict can be obtained; but still the proceeding is wholly his own, and although the issue is said to be formed in the Supreme Court, yet in point of fact that court has nothing at all to do with the matter. The form of certifying papers may be gone through with, but there is no *postea* returned to that court for its action; for there is no action that it can possibly take, nor is there any notice which it can take of the proceedings had in the circuit. The *postea* is returned to the Court of Chancery, where the action properly belongs, and where it must finally be disposed of, and the worst that can be said of the proceeding out-

side of the Court of Chancery proper is, the Chancellor stepping aside as it were, to seek advice in the solution of a doubt, which advice, when obtained, he is in no way bound by, but is wholly at liberty to accept or reject it at pleasure ; the proceeding all the while being a chancery proceeding well known to that court, and must be of necessity of an equitable nature.

It is said that this proceeding before the Circuit Court is a proceeding at law, because there is a technical legal issue framed between the parties.   It is true there is the form of an issue, but it is such a form as was never found in a court of law when made up by the parties.   This issue is termed a *feigned* issue, that is an *unreal* one, and although it may not be dignified with the title of a pious fraud, it may very well be termed an equitable humbug. It was never framed by the parties, nor with their consent, but was imposed upon them by the Chancellor, not improperly I think, for the pure purpose of aiding him in reaching a just and proper conclusion.   All the issue which the parties ever made was by their pleadings in the Court of Chancery.   This was an issue in a proceeding of an equitable nature.   From this issue they have never voluntarily departed, nor asked leave to depart. And it is the same that was transferred, by a kind of legal jargon, to the Circuit Court.   The suit was commenced in the Court of Chancery; it was never out of that court, and it would seem absurd to suppose it could have been in two different courts at the same time.   The reference of the matter to the jury, through the only form in which he could procure their aid, no more removed the cause from the Court of Chancery than if it had been referred to commissioners, or even to a master, to ascertain some particular fact.   The one course is just as much a proceeding in chancery and as well known to its practice as the other.

The conclusion, then, to which I find myself forced is, that the proceeding before the Circuit Court was one of

an equitable nature, caused and created by an order of the Chancellor, which he had a perfect right to make. That this order opened anew the investigation to all evidence that could have been legal at any stage of the cause; that the evidence of John Black was legal evidence at the time it was offered for the purposes contemplated by the statute; that the rejection of it was wrong, and assuming it to be material and important, did great injury to the complainants; and that that wrong can only be remedied by a reversal of this decree: for if we proceed to settle the case now upon its supposed merits, we will be found to do so without this evidence.

It is said that this evidence of John Black might have been taken before the master previous to the closing of the testimony, but this does not so appear. The law which made this evidence legal went into operation on the 4th of July, 1855. The replication was filed in September, 1854. There appears to have been a rule to close testimony, but when it expired does not appear. But all the evidence was taken prior to the 13th of March, 1855, except two unimportant witnesses, who were examined more than a year afterwards, and after the cause seems to have been argued before the Chancellor; and then the evidence was objected to on the ground that the rule to close testimony had expired. But the right to the evidence does not depend on the question; but any witness who was competent in the cause, at any stage of it, was competent before the jury.

I think, therefore, that this decree should be reversed, the verdict of the jury set aside, and a new trial ordered, if denied by the Chancellor, and the case opened to the reception of legal evidence until legally closed, and that the Chancellor make such new decree in the case as to him shall seem just and equitable.

I have not gone into an examination of the merits of the case; I do not think we are in a condition to do so; they are not fully before us. A proceeding has taken

place in which the complainants have been, as I think, greatly wronged. The decree adopts those wrongs, and to have them corrected, I think that decree should be reversed, not on the merits of the case, but that the merits may be better and more fully examined into and the parties more fully and more fairly heard, to the end that exact and equal justice in a case of so much importance may, if possible, be done.

The decree of the Chancellor was affirmed by the following vote:

*For affirmance*—Judges COMBS, HAINES, RISLEY, WHELPLEY, CORNELISON, OGDEN, SWAIN, WOOD.

*For reversal*—VREDENBURGH, VAN DYKE, KENNEDY.